JOSEPH S. ANGELL and PATRICIA E. ANGELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Angell v. Commissioner
Docket No. 17556-83.
United States Tax Court
T.C. Memo 1986-528; 1986 Tax Ct. Memo LEXIS 78; 52 T.C.M. (CCH) 939; T.C.M. (RIA) 86528; October 27, 1986. Thomas C. Baratta, Jr., for the petitioners. Andrew E. Fradkin and Mark L. Cohen, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: Addition to Tax
Calendar Year
Deficiency
Section 6653(b) [1]
1973
$34,477
$17,238
1974
58,504
29,252
1975
52,011
26,005
1976
28,768
14,384
1977
24,927
12,463
1978
5,990
2,995
1979
3,090
1,545
1980
6,705
3,352
In addition to the above determinations, respondent, in an amended answer filed herein, affirmatively pleaded that portions of *80 the above deficiencies are subject to interest at a rate determined under section 6621(d). After concessions, the issues that we must decide are: 1. Whether petitioners are entitled to charitable contribution deductions for tax years 1973 through 1980 in excess of the amounts determined by respondent. 2. Whether petitioners are subject to interest at a rate determined under section 6621(d) on deficiencies attributable to their claimed charitable contribution deductions. 3. Whether petitioner Joseph S. Angell is liable for the addition to tax for fraud under section 6653(b) for tax years 1973 through 1980. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the time they filed their petition herein petitioners Joseph S. Angell (hereinafter "petitioner") and Patricia E. Angell (hereinafter "Patricia"), husband and wife, were residents of River Forest, Illinois. They filed joint Federal income tax returns for each of the years in issue. Petitioner *81 is a medical doctor. He had been engaged in the private practice of medicine for approximately 35 years before beginning work for the Joint Commission on Accreditation of Hospitals in 1977. He worked for the Joint Commission on Accreditation of Hospitals from 1977 to 1980. Petitioner was an art collector. He had extensive experience in buying objects of art from dealers and at auctions. He maintained an insurance policy covering his collection during the period from June 20, 1971 to June 20, 1979.He updated the policy as he added and deleted items to his collection. [3]
*82 In 1972, 1973, 1974, 1975, 1976, and 1978, petitioners donated artwork to Concordia Teachers College and/or Rosary College. [4] They claimed charitable deductions attributable to those donations on their returns for the years 1972 through 1980. In 1972, petitioners donated 12 artworks to Concordia Teachers College. They claimed an $84,300 charitable contribution on their 1972 return for the 12 artworks. [5] Petitioners deducted $61,217 of the contribution from their 1972 income, and carried forward $23,083 to 1973. [6]
In 1973 petitioners donated 28 artworks to Concordia Teachers College. They claimed a $169,265 charitable contribution on their 1973 return for *83 those artworks. [7] Petitioners deducted $97,854 of the contribution from their 1973 income and carried forward $94,494 to 1974. [8]
In 1974 petitioners donated one ceramic statue to Rosary College. They claimed a $32,333 charitable contribution on their 1974 return for the statue. Petitioners deducted the entire $32,333 from their 1974 income, and utilized $76,377 of the $94,494 carried forward from previous years. [9]
In 1975 petitioners donated four artworks to Concordia Teachers College. They claimed a $135,500 charitable contribution on their 1975 return for the four artworks. [10] Petitioners deducted $91,468 of the contribution from their 1975 income and carried forward $62,149 to 1976. [11]
*84 In 1976 petitioners donated one painting to Concordia Teachers College. They claimed a $78,333 charitable contribution on their 1976 return for the painting. Petitioners deducted $49,743 of the contribution from their 1976 income and carried forward $90,739 to 1977. [12]
In 1977 petitioners deducted $40,808 of the carryforward from previous years and carried forward $49,931 to 1978. [13]
In 1978 petitioners donated one painting to Concordia Teachers College. They claimed a $128,333 charitable contribution on their 1978 return from the painting. Petitioners deducted $13,344 of the contribution from their 1978 income and carried forward $164,920 to 1979. [14]
In 1979 and 1980 petitioners utilized $11,043.21 and $16,477.19, respectively, of the carryforward from previous *85 years. Petitioner obtained appraisals of the donated artwork that supported the amounts claimed as charitable contributions, and attached copies of those appraisals to the returns on which he claimed the contributions. Petitioner had actively sought to obtain high appraisals for the artworks. On occasion, he had purchased artwork on the condition that the seller both provide a high appraisal, and obtain supporting high appraisals from others. Both the appraisals and the amounts claimed as charitable contributions greatly exceeded the amounts petitioners paid for the artworks, where such price was established. [15] Petitioners failed to insure many of the artworks, and when they did insure them, they insured them for significantly less than they claimed as charitable contributions. [16] Petitioner notified Rosary College in 1974 that although the artwork that he had donated to it had been appraised at over $30,000, it was only necessary for Rosary College to insure it for $10,000. [17] We find that the evidence demonstrates clearly and convincingly that petitioner knew the appraisals were inflated, and that the artworks had a fair market value of significantly less than the amounts *86 he claimed as charitable contributions. Respondent audited petitioners' returns for 1972 through 1980 and determined that petitioners had overstated their charitable contributions for the artwork that they had donated to charity during those years. [18] Respondent determined that the value of the twelve items of artwork petitioners donated in 1972, which petitioners valued at $84,300, did not exceed the $61,307 deduction that petitioners had claimed for them on their 1972 return. [19] This in effect disallowed the $23,083 claimed by petitioners as a charitable contribution carryover from 1972. *87 Respondent additionally determined that the total value of the artworks petitioners donated in 1973, 1974, 1975, 1976, and 1978, which petitioners valued at a total of $543,764, did not exceed $43,700. [20] Respondent determined that petitioner's overstatement of the values of the donated artwork was fraudulent, and that petitioner is liable for the section 6653(b) civil fraud addition to tax. In his amended answer, respondent affirmatively pleaded that petitioners are subject to interest at a rate determined under section 6621(d) on deficiencies attributable to the charitable contributions of the artwork. ULTIMATE FINDINGS OF FACT 1.Petitioners grossly overstated the values *88 of the donated artworks. 2. The charitable contributions of artworks for years 1973 through 1980 were tax motivated transactions within the purview of section 6621(d) that caused petitioners to substantially underpay their taxes during those years. 3.Part of the deficiency for each year at issue was due to petitioner's fraud. OPINION Deficiency
We address at the outset petitioners' argument that respondent is barred from examining their 1972 charitable contributions. Petitioners argue that the statute of limitations bars respondent from assessing a deficiency for 1972, a year for which no statutory notice was issued and which is not before this Court, and that respondent is therefore barred from examining their 1972 charitable contributions. Petitioners misunderstand the effect of the statute of limitations. Respondent is free to examine items that appear on a return for a year that is closed for assessment purposes, provided the items affect later taxable years remaining open for assessment purposes. Barenholtz v. United States,784 F.2d 375, 380-381 (Fed. Cir. 1986). *89 As petitioners' charitable contributions claimed in 1972 created a carryforward to 1973, a year which is properly before the Court, respondent was free to examine them regardless of whether the statute of limitations bars him from assessing a deficiency for 1972. Sec. 6214(b); Ritter Lumber Co. v. Commissioner,30 B.T.A. 231, 277 (1934), modified on another issue 33 B.T.A. 117 (1935). We next address the issue of whether respondent correctly determined petitioners' charitable contributions. Petitioners are entitled to claim as charitable contributions the fair market value of the artworks, as of the dates they contributed them to charity, reduced when applicable as provided in section 170(e). Sec. 1.170A-1(e)(1), Income Tax Regs. Petitioners argue that the fair market values of the artworks claimed as charitable contributions exceeded the amounts determined by respondent. [21]
*90 Fair market value is a question of fact to be determined by an examination of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985). Petitioners have the burden of proof in these matters. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). They must overcome the presumption of correctness that attaches to respondent's determination, and they must persuade this Court, by a preponderance of the evidence, that respondent's determination is incorrect. Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133, cert. denied 423 U.S. 1015 (1975). In the present case expert witnesses appraised the fair market values of the contributed artworks. Their opinions are admissible and relevant to the issue of value. Their opinions must, however, be weighed in light of their qualifications and all other relevant evidence of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). *91 We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). Petitioners rely on appraisals performed by Harold R. Pick to establish that the fair market values of the artworks exceeded the amounts determined by respondent. [22] Pick had been a seller and appraiser of art for over 35 years. He appraised art approximately 250 times a year during that period. Pick traveled to Concordia and Rosary Colleges and *92 viewed the contributed artworks. After viewing the artworks, he prepared a written report appraising only one of the works contributed in 1972 at $7,500, and 18 works contributed from 1973 to 1978, the values of which are in contention, at $82,800. [23] Petitioners had valued the artworks on their returns at $35,000 and $531,664, respectively. Pick made no attempt to authenticate the artworks, but instead assumed that the artworks were unauthenticated. Pick based his appraisals solely on his "street knowledge" of what the artworks would sell for, regardless of who had painted them. He did not support his appraisals with data on comparable sales. Respondent rebutted Pick's appraisals with the testimony of Everett Fahy. Fahy had extensive academic and practical experience in the field *93 of artwork. Academically, he held a doctorate from Harvard, had taught at Harvard and New York University, and had published numerous scholarly works. Practically, he had served as Curator-in-Charge of the Department of European Paintings of the Metropolitan Museum of Art, and as Director of the Frick Collection. In those capacities, he frequently appraised unauthenticated artworks. Fahy viewed the contributed artworks and prepared a written report in which he assessed their artistic merit and estimated their value. The report indicated that the artworks had little artistic merit, and that the amounts claimed as charitable contributions by petitioners were gross overvaluations. [24] His report indicated that Pick had over-appraised the value of the donated artworks, and he testified at trial that he considered Pick's appraisals to be inconceivably high. [25] Fahy's report and testimony convincingly rebut Pick's appraisals. If anything, they would appear to support lower valuations, in many cases, than respondent used.We hold that respondent's determinations of the values of petitioners' charitable contributions of artwork have not been shown to be in error. *94 Section 6621(d)
Respondent determined by amended answer that the portion of the deficiencies in income tax for the years 1973 through 1980 attributable to petitioners' charitable contributions were from tax motivated transactions. Respondent further determined that the charitable contributions resulted in substantial underpayments and that those underpayments are subject to interest at a rate determined under section 6621(d). On this new issue, respondent had the burden of proof. Rule 142(a). Section 6621(d) provides for a rate of interest on deficiencies attributable to tax motivated transactions of 120 percent of the adjusted rate determined under section 6621(b). The rate applies to interest accruing after December 31, 1984, even if the tax motivated transaction occurred prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); sec. 301.6621-2T, Q-10 and A-10, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50393 (Dec. 28, 1984). To be subject *95 to the rate, the deficiency attributable to the tax motivated transaction must be a substantial underpayment.[26]
Section 6621(d)(3) defines tax motivated transactions to include, inter alia, "any valuation overstatement (within the meaning of section 6659(c))." Section 6659(c) defines valuation overstatement as a claim on a return of "the value of any property, or the adjusted basis of any property" of "150 percent or more of the amount determined to be the correct amount." Where multiple items of a similar nature are donated within the same taxable year, the aggregate value claimed by the taxpayer is compared to the aggregate value determined to be correct to establish if there has been a valuation overstatement. Neely v. Commissioner,85 T.C. 934, 958 (1985). *96 We conclude that the deficiencies attributable to petitioners' charitable contributions claimed for artworks donated from 1973 through 1978 are subject to interest at the rate provided by section 6621(d). First, we have found that the values claimed for those artworks for each year totaled 150 percent or more of the correct values. That qualifies the claimed charitable contributions as tax motivated transactions. Second, we have found that petitioners' underpayments attributable to those charitable contributions exceed $1,000 for each of the years in issue. That qualifies the underpayments as substantial underpayments. We conclude that respondent has not met his burden of proving that the deficiency attributable to his disallowance of petitioners' carryforward from 1972 is subject to interest at the rate provided by section 6621(d).Respondent failed to establish that the $84,300 claimed value of the artworks contributed in 1972, which created the carryforward, was a valuation over-statement. [27] Application of the rate provided by section 6621(d) shall be made to the amount of the substantial underpayment determined pursuant to Rule 155 in accordance with Temporary Regulation *97 section 301.6621-2T, Proced. & Admin. Regs., 49 Fed. Reg. 50390 (Dec. 28, 1984). Civil Fraud
Respondent determined that petitioner is liable for the addition to tax for fraud as provided by section 6653(b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). It may, however, be proven by circumstantial evidence, as direct *98 proof of a taxpayer's intent is often not available. The taxpayer's entire course of conduct may be examined in order to determine whether the fraudulent intent is present. Stone v. Commissioner,56 T.C. 213, 224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). It is unnecessary for respondent to prove the exact amount of the charitable contributions that was fraudulently claimed, as section 6653(b) applies to each year's entire deficiency if any portion of it was due to fraud. Drybrough v. Commissioner,238 F.2d 735, 740 (6th Cir. 1956), affg. 23 T.C. 1105 (1955); Smith v. Commissioner,32 T.C. 985, 987 (1959). Fraud is established if it is shown that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such *99 taxes. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Knowingly overstating deductions constitutes fraud. Biggs v. Commissioner,440 F.2d 1, 6 (6th Cir. 1971), affg. T.C. Memo. 1968-240; Hicks Co. v. Commissioner,56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner,52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970). A careful and complete review of the facts of this case convinces us that petitioner was aware that the amounts he claimed as charitable contributions exceeded the fair market value of the artworks contributed, and that he intentionally claimed the excess amounts to avoid tax that he knew would otherwise be assessed and collected by respondent. The evidence established that petitioner claimed charitable contributions over a seven year period that consistently greatly exceeded the fair market value of the artworks he donated to charity. [28] Petitioner's explanation *100 for his action is that he was the passive victim of inflated appraisals that he had obtained for insurance purposes. The evidence clearly and convincingly establishes otherwise. It demonstrates that petitioner purchased the contributed artworks for a fraction of the amounts he claimed as charitable contributions. That fact alone does not lead us to conclude that he knew that the values he claimed were inflated. Other facts negate petitioner's assertion that he believed that the amounts he claimed as charitable contributions reflected the fair market values of the artworks, and confirm that he was aware that their values were significantly less than he claimed. [29]
*101 We found that petitioner actively sought inflated appraisals to support the amounts he claimed as charitable deductions.We further found that petitioner insured the contributed artworks for amounts that were only small fractions of the values indicated on the appraisals. We recognize that parties do not always insure items for what they believe to be their fair market values. Petitioner asserts that he deliberately insured the artworks for less than he believed to be their fair market values only to reduce his insurance premiums, and that he believed the appraisals accurately reflected the fair market values of the artworks. That argument was refuted by the testimony of SisterVirginia Turner. Sister Turner was employed as Director of Development at Rosary College in 1974, when petitioner contributed a statute to the college. She questioned petitioner in 1974 as to whether it was necessary to insure the statute, which had been appraised at over $32,000, for the amount of the appraisal. Petitioner told Sister Turner that $10,000 of insurance would be adequate, and then claimed $32,333 on his 1974 return as a charitable contribution for the statue. The fact that he told a third *102 party to insure an artwork for only a fraction of an appraisal confirms that he was not insuring the artworks for less than their fair market values only to reduce his insurance premiums. It convincingly illustrates that he knew that the appraisals and the amounts he claimed as charitable contributions were inflated. In sum, the evidence in this case leads inescapably to the conclusion that petitioner's course of conduct had but one purpose: to fraudulently prevent the collection of taxes he knew he owed. We conclude that respondent properly determined that petitioner is liable for the addition to tax for civil fraud as provided by section 6653(b). Decision will be entered under Rule 155.
Appendix I 1972 Donations to
Concordia Teachers College
Value
Value
Claimed on
Determined
Purchase
Purchase
Item
1972 Return
by Respondent
Date *
Price *
Ceramic
Figural Group
$ 2,100
Paintings
The Deposition
15,000
5/20/72
$1,100
Departure of Rebecca
5,000
2/27/72
1,300
Portrait of St. Eustace
3,000
2/27/72
425
Battle Scene
9,000
Head of John the Baptist
8,500
5/20/72
325
Holy Family with St. John
35,000
Etchings
Rembrandt Etchings (5)
6,700
Total
$84,300 ** $61,307
*103 1972 Donations to
Concordia Teachers College
Value Per
Date
Insurance
Petitioners'
Item
Insured *
Coverage *
Expert Pick
Ceramic
Figural Group
Paintings
The Deposition
Departure of Rebecca
3/10/72
1,300
Portrait of St. Eustace
3/10/72
1,425
Battle Scene
Head of John the Baptist
Holy Family with St. John
$7,500
Etchings
Rembrandt Etchings (5)
3/10/72
2,950
Total
Appendix II 1973 Donations to
Concordia Teachers College
Value Per
Value Claimed
Value Determined
Petitioners'
Item
on 1973 Return
By Respondent
Expert Pick
Ceramics
Sixteen Miscellaneous
$ 10,900
$10,900
* $10,900  Cyrano de Bergerac
13,500
2,500
5,000
Sacred Heart of Jesus
11,333
1,000
4,000
Joan de Arc
9,533
1,800
3,000
Bluebeard
5,850
1,800
3,000
St. George
5,217
1,800
3,000
Don Quixote
4,633
1,500
2,500
Sir Lancelot
3,100
1,000
1,800
Sculpture
Clodion
7,500
1,000
4,000
Paintings
Christ & Disciples
41,666
2,000
7,500
Landscape
20,833
2,000
4,500
Madonna & Child
34,000
4,000
7,500
Seascape
1,200
1,200
* 1,200
Total
$169,265
$32,500
$57,900
*104 1973 Donations to
Concordia Teachers College
Purchase
Purchase
Date
Insurance
Item
Date **
Price **
Insured **
Coverage **
Ceramics
Sixteen Miscellaneous
Cyrano de Bergerac
3/23/73 $2,750
Sacred Heart of Jesus
10/13/73
3,875
Joan de Arc
Bluebeard
St. George
Don Quixote
Sir Lancelot
Sculpture
Clodion
Paintings
Christ & Disciples
Landscape
Madonna & Child
Seascape
3/10/72
1,450
Total
Appendix III 1974, 1975, 1976, and 1978
Donations
Value Per
Value Claimed
Value Determined
Petitioners'
Item
on 1973 Return
By Respondent
Expert Pick
1974
Ceramic
The Blessed Virgin
$ 32,333
$ 3,000
$ 7,500
1975
Ceramics
The Last Supper
$ 31,000
$ 2,000
$ 4,500
Crucifixion of Christ
17,000
1,800
5,000
Paintings
Portrait of Jane
Stuart
12,500
400
2,500
Madonna & Child
75,000
1,000
5,000
1975 Total
$135,500
$ 5,200
$17,000
1976
Painting
English Countryside
$78,333
$ 1,500
$ 7,500
1978
Painting
Head of Christ
$128,333
$ 1,500
$ 5,000
Total of Artwork
Contributions 1973-78
$543,764
$43,700
$94,900
*105 1974, 1975, 1976, and 1978
Donations
Purchase
Purchase
Date
Insurance
Item
Date *
Price *
Insured
Coverage
1974
Ceramic
The Blessed Virgin
9/25/74
$3,200
1975
Ceramics
The Last Supper
Crucifixion of Christ
3/23/73
3,600
5/1/73
5,000
Paintings
Portrait of Jane
Stuart
4,375
Madonna & Child
4,375
1975 Total
1976
Painting
English Countryside
12,500
5/1/73
15,000
1978
Painting
Head of Christ
7/21/76
5,000
Total of Artwork
Contributions 1973-78
Appendix IV Effect of Respondent's Determinations
on Petitioners' Charitable Contribution Deductions
Charitable Contributions
1973
1973
1974
1974
1975
1975
Per
Per
Per
Per
Per
Per
Return
Resp.
Return
Resp.
Return
Resp.
Artworks
$169,265
$ 32,500
$ 32,333
$ 3,000
$135,500
$ 5,200
Other
6,075
6,075
835
835
1,347
1,347
Contribution carryforward
23,083
94,494
18,117
Total Contributions
$198,423
$ 38,575
$127,662
$ 3,835
$154,964
$ 6,547
Amount deducted per return
$103,929
$103,929
$109,545
$109,545
$ 92,815
$92,815
Reduction
$ 65,354
$105,710
$86,268
Carryforward
$ 94,494
$ 18,117
$ 62,149
*106 Effect of Respondent's Determinations
on Petitioners' Charitable Contribution Deductions
Charitable Contributions
1976
1976
1977
1977
1978
1978
Per
Per
Per
Per
Per
Per
Return
Resp.
Return
Resp.
Return
Resp.
Artworks
$ 78,333
$ 1,500
$128,333
$ 1,500
Other
1,462
1,462
4,459
4,459
1,380
1,380
Contribution Carryforward
62,149
90,739
49,931
$141,944
$ 2,962
$95,198
$ 4,459
$179,644
$ 2,880
Amount deducted per return
$ 51,205
$51,205
$45,267
$45,267
$ 14,724
$14,724
Reduction
$48,243
$40,808
$11,844
Carryforward
$ 90,739
$49,931
$164,920
Effect of Respondent's Determinations
on Petitioners' Charitable Contribution Deductions
Charitable Contributions
1979
1979
1980
1980
Per Return
Per Resp.
Per Return
Per Resp.
Artworks
Other
270.00
270.00
65.00
65.00
Contribution carryforward
164,940.00
153,897.00
165,210.00
$ 270.00
$153,962.00
$ 65.00
Amount deducted per return
$ 11,313.21
$11,313.21
$ 16,542.19
$16,542.19
Reduction
$11,043.21
$16,477.19
Carryforward
$153,896.79
$137,419.81
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Respondent's determinations of additions to tax were as to petitioner Joseph S. Angell only.↩
3. For instance, petitioner's policy insured 328 items for $609,762 as of June 20, 1971. Petitioner added 31 items to the policy effective March 10, 1972, and insured them for $179,302. The $179,302 of additional insurance increased his premium $77. Petitioner added 10 more items to the policy effective May 1, 1972, and insured them for $89,048. The $89,048 of additional insurance increased his premium $18. Petitioner added 13 items to the policy, and deleted 4 items from the policy, effective June 1, 1972, which increased his insurance coverage by $60,745. The $60,745 of additional insurance increased his premium $5. As of June 1, 1972, petitioner carried $938,857 of insurance on 378 items of art.↩
4. Concordia Teachers College and Rosary College, both located in River Forest, Illinois, were educational institutions within the meaning of sec. 501(c)(3) at all times relevant to this action.↩
5. The value petitioners claimed for each of the 12 artworks is set forth in Appendix I. ↩
6. See. 170(d) limits the amount of individuals' charitable deductions to 50 percent of their adjusted gross income. Contributions that exceed 50 percent of adjusted gross income can be carried over to the five succeeding years.↩
7. The value petitioners claimed for each of the 28 artworks is set forth in Appendix II. ↩
8. The $94,494 consisted of the $23,083 carryover from 1972 and $71,411 of the value of the artworks donated in 1973.↩
9. See Appendix III. Petitioners carried forward to 1975 $18,117 of the value of the artworks donated in 1973.↩
10. The value petitioners claimed for each of the four artworks is set forth in Appendix III. ↩
11. The $62,149 consisted of the $18,117 carryover from 1973 and $44,032 of the value of the artworks donated in 1975.↩
12. See Appendix III. The $90,739 consisted of $18,117 from 1973, $44,032 from 1975, and $28,590 of the value of the painting donated in 1976.↩
13. The $49,931 carryforward to 1978 consisted of $21,341 from 1975, and $28,590 from 1976.↩
14. See Appendix III. The $164,920 carryforward to 1979 consisted of $21,341 from 1975, $28,590 from 1976, and $114,989 of the value of the painting donated in 1978.↩
15. The record does not reflect the price petitioners paid for each artwork. When the record did establish the prices petitioners paid for individual artworks, it established without exception that petitioners paid much less than they claimed as charitable contributions. Our findings of the prices paid for the artworks are set forth in Appendices I, II and III. ↩
16. Our findings of the insurance coverage petitioners carried on each piece of artwork are set forth in Appendices I, II and III. ↩
17. Petitioners claimed a charitable contribution of $32,333 for the artwork on their 1974 return.↩
18. Respondent's determination of the charitable contributions resulted in underpayments of more than $1,000 in each of the years in issue. The effect of respondent's determination on petitioners' charitable contribution deduction for each year is set forth at Appendix IV. ↩
19. The value petitioners claimed for each artwork donated in 1972 is set forth at Appendix I. ↩
20. The value petitioners claimed for each artwork, and the value determined by respondent, is set forth at Appendices II and III.↩
21. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.↩
22. It is clear that the amounts originally claimed as charitable contributions greatly exceeded the fair market values of the artworks, except in two cases in 1973. Although petitioners attached appraisals made by various parties to their tax returns to support the amounts claimed as charitable contributions, they no longer argue that those appraisals reflect the fair market values of the artworks. None of these appraisers were called as witnesses by petitioners. We accord those appraisals no probative weight.↩
23. Respondent did not contest the value petitioners claimed for 17 of the 35 artworks contributed from 1973 to 1978. Those 17 items represented only $12,100 of the $543,764 total contribution claimed for the 35 artworks. Pick's appraisal of the value of each artwork is set forth in Appendices I, II and III. For completeness, the 17 uncontested items in 1973, and their values, are also shown.↩
24. He determined, for example, that the ceramic rendition of the Crucifixion of Christ that petitioners valued at $17,000 on their 1975 return, and that Pick appraised at $5,000, had a value of only $200.His research revealed that the painting of the English Countryside that petitioners valued at $78,333 on their 1976 return, and that Pick appraised at $7,500, had sold for only $600 at the Sotheby Park Bernet Gallery in New York on September 29, 1972. ↩
25. Fahy concluded that none of the artworks attributed to well-known artists were in fact authentic works of those artists.↩
26. Sec. 6621(d)(2)↩ defines substantial underpayment as "any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000."
27. See Appendix I. Respondent determined only that the artworks donated in 1972 had a correct value of no more than $61,307. The value petitioners claimed, $84,300, is less than 150 percent of $61,307.↩
28. A consistent pattern of actions that understate income is persuasive evidence of fraud. Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), cert. denied 397 U.S. 962 (1970). See also Candela v. United States,↩ 635 F.2d 127i, 1274 (7th Cir. 1980).
29. Petitioner was an evasive and forgetful witness, and we accord his testimony little evidentiary weight. Our finding of fraud does not, however, rest on our determination that petitioner was not a credible witness. We hold respondent affirmatively met his burden of proof by introducing evidence that clearly and convincingly demonstrated that petitioner's charitable deductions were fraudulent.↩
*. A blank spot under this column indicates that the information was not evident from the record. ** The record reflects that respondent determined that the total value of the artworks did not exceed $61,307, but does not evidence the specific value determined for each artwork.↩
*. Item was not valued by petitioners' expert as value of item is not disputed. ** A blank spot under this column indicates that the information was not evident from the record.↩
*. A blank spot under this column indicates that the information was not evident from the record.↩