Opinion by JUDGE DAILEY
*650 ¶ 1 A conservation easement (CE) "is a permanent restriction that runs with the land for the purpose of protecting and preserving the land in a predominantly natural, scenic, or open condition." Kowalchik v. Brohl, 2012 COA 25, ¶ 2, 277 P.3d 885 ; see also §§ 38-30.5-101 to-111, C.R.S.2014 (establishing the purposes and requirements for conservation easements).
¶ 2 In Colorado, a taxpayer may claim a state income tax credit, all or part of which is transferable to third parties and which may be carried forward for up to twenty years, in connection with a donation of a qualifying CE to a governmental entity or charitable organization. See § 39-22-522(2), (5), & (7), C.R.S.2014; see also § 39-22-522(4)(a)(I) (allowing taxpayer to claim 100% of the first $100,000 of CE value and 40% of any additional value, not to exceed a credit of $260,000).
¶ 3 The question presented in this case is: How long does the Colorado Department of Revenue (the Department) have to review the validity and value of CE tax credits? May the Department review the validity and value of those credits in each of the twenty years in which they may be claimed and carried forward? Or, must it complete its review within four years from the first time the credits are claimed?
¶ 4 On behalf of themselves and others to whom they had transferred CE tax credits, plaintiffs Ricky L. Markus, Kay L. Markus, Garrett J. Markus, Jade L. Markus, Edward Lee Mayo, and Kristie Mayo, took the latter position, with which the district court agreed. Because we too agree with that position, we affirm the district court's entry of summary judgment in favor of plaintiffs and against defendant, Barbara Brohl, the Executive Director of the Department.
I. Background
¶ 5 In 2004, three pairs of landowners-Ricky and Kay Markus, their sons, Garrett and Jade Markus, and Edward Lee and Kristie Mayo-created CEs on their lands, had them appraised, and sold them to a governmental entity (i.e., the Otero County Land Trust) for a portion of their appraised value. They attached to their 2004 state income tax returns documents notifying the Department that they were claiming CE tax credits and applying part of those credits against their 2004 income tax liability.[1] The landowners (hereafter, CE donors) carried forward the remainder of the claimed CE credits, some for their personal use, and some for the use of third parties, to offset income tax liabilities in future years.
¶ 6 On September 28, 2009, the Department disallowed the Mayos' entire claim of a CE tax credit primarily because of a purported deficiency in the appraisal upon which the Mayos relied. For the same reason, the Department, on April 13, 2010, disallowed the claims of CE tax credits by each pair of Markuses. Because of a four-year limitations period, the disallowances affected only the donors' use of claimed CE credits in the 2005-2008 tax years.
¶ 7 Rather than challenging the disallowances at an administrative hearing before the Department, the CE donors appealed them to the district court pursuant to § 39-22-522.5(2), C.R.S.2014.
¶ 8 The parties filed cross-motions for summary judgment. In their motion, the CE
*651 donors argued that the four-year limitations period of § 39-21-107(2), C.R.S.2014, had expired before the Department acted to disallow their tax credits. In this regard, they asserted that the limitations period had commenced on the entirety of their claimed CE credits when they first claimed the credits on their 2004 tax returns-which, under the law, would have been on April 15, 2005. See § 39-21-107(3).
¶ 9 The Department, however, asserted that the limitations period commenced each time a CE donor or transferee applied CE credit to his or her tax liability, and that it could evaluate the validity and extent of the original claims of CE credit for purposes of disallowing the use of credits for the 2005-08 tax years. In the alternative, it argued that summary judgment was inappropriate in any event because issues of material fact existed as to whether the limitations period was tolled by the filing of false or fraudulent tax returns by the CE donors.
¶ 10 The district court entered summary judgment in favor of the CE donors, concluding, on the primary point of contention, that, because of the uniqueness of Colorado's CE tax credit statute,
• the limitations period commences (as argued by the CE donors) against the entirety of the claimed CE credit "upon the donor's ... initial claim of the [CE] tax credit, rather than [as argued by the Department] upon a taxpayer's individual [yearly] use of the credit against his income";
• measured from April 15, 2005, the four-year limitations period had expired on the entirety of the asserted CE credits prior to the Department's disallowances of those credits; and,
• consequently, "the substantive validity and valuation of the [CE donor]'s original credit claim are not facts that [the Department] may redetermine for a closed income tax year to assess tax in an open year."
¶ 11 With respect to the Department's alternative ground for resisting summary judgment, the court concluded that there was insufficient evidence of fraud or an intent to evade taxes by the CE donors to create a genuine issue of material fact on the tolling issue.
II. Analysis
¶ 12 The Department contends that the district court erred in granting summary judgment to the CE donors based on its determinations that (1) the limitations period had expired with respect to the Department's ability to redetermine, for any tax year, the value and validity of the claimed CE tax credits; and (2) no genuine dispute of material fact existed as to whether the CE donors filed false or fraudulent tax returns.
¶ 13 " 'The purpose of the summary judgment "is to permit the parties to pierce the formal allegations of the pleadings and save the time and expense connected with a trial when, as a matter of law, based on undisputed facts, one party could not prevail." ' " Roberts v. Am. Family Mut. Ins. Co., 144 P.3d 546, 548 (Colo.2006) (quoting Mount Emmons Mining Co. v. Town of Crested Butte, 690 P.2d 231, 238 (Colo.1984) ). Because summary judgment is a drastic remedy, however, it is appropriate only where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c) ; Sanchez v. Moosburger, 187 P.3d 1185, 1187 (Colo.App.2008).
¶ 14 With these general principles in mind, we address each of the Department's contentions.
A. Limitations Period for Challenging Claimed CE Credits
¶ 15 To resolve the Department's first contention, we must address the interplay between the general statute of limitations for tax matters, section 39-21-107(2), and a "statute of limitations" provision specifically addressing the subject of CE tax credits in section 39-22-522.
¶ 16 The general statute of limitations provides that "the assessment of any tax, penalties, and interest shall be made within one year after the expiration of the time provided for assessing a deficiency in federal income tax ...." § 39-21-107(2). Because the time *652 for assessing a deficiency in federal income tax is three years, see 26 U.S.C. § 6501(a) (2012), the limitations period under section 39-21-107(2) is four years. See Dep't of Revenue Reg. 201-1, 1 Code Colo. Regs. 201-1:39-21-107(2).
¶ 17 The question, in this case, is what triggers the commencement of this four-year period.
¶ 18 Under federal law, each tax return is "the origin of a new liability," meaning that a new limitations period begins each time a tax return is received by the taxing authority. Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898 (1948) ; see Dingman v. Comm'r of Internal Revenue, 101 T.C.M. (CCH) 1562, at *7 (T.C.2011) (the federal statute of limitations begins to run for each tax year when the Internal Revenue Service (IRS) receives the taxpayer's return for that year). Because "each separate year [i] s a unit to itself," the IRS may "consider facts relating to taxes of other taxable years in order correctly to determine the amount of taxes for the years in question, but not to determine whether the tax for any other [limitations-barred] taxable year has been overpaid or underpaid." Phoenix Coal Co. v. Comm'r of Internal Revenue, 231 F.2d 420, 421 (2d Cir.1956) ; see also Barenholtz v. United States, 784 F.2d 375, 380-81 (Fed.Cir.1986) ("It is well settled that the IRS and the courts may recompute taxable income in a closed year in order to determine tax liability in an open year.").
¶ 19 Accordingly, the federal statute of limitations for the assessment of taxes, 26 U.S.C. § 6501(a), "bars [tax] assessments, not calculations" for tax years for which the limitations period has run. Barenholtz, 784 F.2d at 380 ; see also 26 U.S.C. § 6214(b) (2012) ("The Tax Court in redetermining a deficiency of income tax for any taxable year ... shall consider such facts with relation to the taxes for other years or calendar quarters as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year or calendar quarter has been overpaid or underpaid.").
¶ 20 A taxpayer may claim a charitable deduction on his federal income tax return, parts of which may be carried forward for fifteen years, to the extent that he donates all or part of a qualifying CE to a governmental entity or charitable organization. 26 U.S.C. §§ 170(b)(1)(E), (h) (2012). Under federal law, each use of a federal CE tax deduction to reduce income triggers a new limitations period within which the IRS may evaluate the validity or amount of the deduction, even where the deduction was originally claimed on a tax return filed outside the limitations period. See Zarlengo v. Comm'r of Internal Revenue, 108 T.C.M. (CCH) 155, at *10 (T.C.2014) (although taxpayer claimed a federal CE tax deduction in a closed year, the taxpayer's use of the deduction as a carry forward in years for which the statute of limitations had not yet run allowed the IRS to invalidate the credit and disallow such use for those years); see also Crocker v. Comm'r of Internal Revenue, 75 T.C.M. (CCH) 2414, n. 37 (T.C.1998) ("Although the [in this case, non-CE] charitable contribution from which the carryovers arose was [claimed] outside of the[ ] periods, [the statute of limitations] does not foreclose this Court from looking to a closed year to redetermine petitioners' tax liability for the years at issue."); Angell v. Comm'r of Internal Revenue, 52 T.C.M. (CCH) 939 (T.C.1986) (Because "[the IRS] is free to examine items that appear on a return for a year that is closed for assessment purposes, provided the items affect later taxable years remaining open for assessment purposes," the IRS was free to examine the, in this case, non-CE charitable contributions claimed in a closed year but carried forward to an open year.), aff'd, 861 F.2d 723 (7th Cir.1988) ; cf. Hill v. Comm'r of Internal Revenue, 95 T.C. 437, 440 (1990) (A taxing authority "can recompute the amount of an unused investment credit carryover from a barred year in order to determine the tax due for an open year.").
¶ 21 If, then, we were considering only Colorado's general statute of limitations, conditioned, as it is, on the time for assessing "a deficiency in federal income tax," we would be inclined to agree with the Department's *653 position that it could evaluate the validity or amount of a CE tax credit more than four years from when it was first claimed for purposes of disputing tax liability within the past four years. See § 39-22-103(11), C.R.S.2014 ("Due consideration shall be given in the interpretation of [the income tax] article to applicable sections of the internal revenue code in effect from time to time and to federal rulings and regulations interpreting such sections if such statute, rulings, and regulations do not conflict with the provisions of this article.").
¶ 22 However, the general statute of limitations is not the only statute bearing on this subject. Colorado also has a statute which specifically addresses the tax consequences of a CE. As noted by the district court, under that statute, claimed CE tax credits can be transferred to third parties who are then bound by "the same statute of limitations" as the CE donor:
The donor of [a CE] for which a tax credit is claimed or the transferor of a tax credit transferred ... shall be the tax matters representative in all matters with respect to the credit. The tax matters representative ... shall be responsible for representing and binding the transferees with respect to all issues affecting the credit, including, but not limited to, the charitable contribution deduction, the appraisal, notifications and correspondence from and with the department of revenue, audit examinations, assessments or refunds, settlement agreements, and the statute of limitations. The transferee shall be subject to the same statute of limitations with respect to the credit as the transferor of the credit.
§ 39-22-522(7)(i).[2]
¶ 23 Although the statute talks in terms of CE donors and "transferors," both terms refer to CE donors, that is, to a CE donor who holds onto the tax credits for himself or a CE donor who transfers CE credits to another. That follows because one who receives CE credits from a donor cannot, in turn, transfer those credits to others. Dep't of Revenue Reg. 201-2, 1 Code Colo. Regs. 201-2:39-22-522(3)(b) ("A credit can be transferred only once. A transferee, to whom a credit is transferred, cannot thereafter transfer the credit to another taxpayer."). Consequently, section 39-22-522(7)(i) treats the CE donor, also known as the tax matters representative (TMR), and any transferee(s) as one entity in all matters-including the operation of a limitations period-related to the value and validity of the CE tax credit itself. "The value and validity of a gross conservation easement credit held by a transferee is derived from, and dependent on, the credit generated and/or transferred by the TMR." 1 Code Colo. Regs. 201-2:39-22-522(3)(j)(i) & (vii) (explaining that the CE donor and transferees are subject only to the same statute of limitations with regard to "Transfer Item Adjustments," which are concerned with original validity and value of the credit, as well as adjustments thereto).
¶ 24 Section 39-22-522(7)(i) does not, however, reveal how that shared "donor/transferee" limitations period is supposed to work. Does it operate, like the federal limitations period, with "separate taxable units," for each of the twenty years that CE tax credits may be claimed and carried forward? Or does it operate differently, with but one four-year limitations period, commencing with the first time a credit is claimed, and after which the validity and value of the original CE cannot be questioned?
¶ 25 Intuitively, it would seem that a tax credit transferee could not "share" the donor's limitations period if, as the Department asserts, the two could be subject to different limitation periods depending on when they filed their tax returns. (Under the federal model, a new limitations period would commence with each use of the credit, resulting in potentially numerous limitations periods, *654 and years in which the donor's claim of a credit would not overlap with a transferee's use of that same credit would obviously not share the "same" limitations period.)
¶ 26 To the extent the statute could be considered ambiguous on this point, we may resolve that ambiguity by considering, among other things, the statute's purpose, the statute's legislative history, and the consequences of a particular construction of the statute. See State v. Nieto, 993 P.2d 493, 500-01 (Colo.2000) ; see also § 2-4-203(1)(a), (c), & (e), C.R.S.2014.
¶ 27 We discern two purposes for the CE tax credit statute: (1) to incentivize donation of CEs for the public welfare, see § 39-22-522.5(1)(a) (The CE tax credit program "balance[s] economic needs with natural resources ... preservation" and "allow[s] many farmers and ranchers the opportunity to donate their development rights to preserve a legacy of open spaces in Colorado for wildlife, agriculture, and ranching."); and (2) to provide pecuniary relief for land-rich, cash-poor individuals. See Jessica E. Jay, Changes to Colorado's Conservation Income Tax Credit Law, 32 Colo. Law. 65, 65 (Feb.2003) ( Section 39-22-522.5 was designed to "provide a source of income" to "Colorado's land-rich, but cash-poor landowners, such as farmers and ranchers," who donate CEs.).
¶ 28 To accomplish this second purpose, section 39-22-522 allows CE donors to use CE tax credits to reduce their income taxes or as a commodity that can be sold to third parties. See id. ; see also C. Timothy Lindstrom, State Tax Incentives for Conservation Easements Can Benefit Everyone, 12 J. Multistate Tax'n & Incentives 20, 25 (2002) ("Several states have sought to significantly increase the effectiveness of their [CE] credits by making them transferable to other taxpayers who can use them. Transferability creates the opportunity for the sale of unused credits, generating income in connection with the easement donation."); Christen Linke Young, Conservation Easement Tax Credits in Environmental Federalism, 117 Yale L.J. Pocket Part 218, 223 (2008) ("Many conservationists view transferable credits as their most effective tool for land protection, since transferable credits offer donors an immediate cash benefit in exchange for an easement.").
¶ 29 A CE donor can "reasonably expect" to sell tax credits for "about eighty cents on the dollar-with 10 cents on the dollar (or a 10 percent reduction) offered to attract buyers; and 10 cents on the dollar (or a 10 percent commission) taken by a broker," although such commissions can be avoided where the donor sells the credits directly. See Jay, Changes to Colorado's Conservation Income Tax Credit Law, at 65. Such sales are financially beneficial for both seller and buyer:
From the perspective of the buyer, purchasing a value of $100,000 in tax credits for $90,000 was a savings of $10,000 tax per credit purchased. There was no limit on the amount of tax credits a buyer could purchase. Because the purchasers of these credits likely had to pay state income taxes, they had reason to take advantage of the bargain offered by conservation tax credits.
Id. (describing the benefits of credit transfers prior to the 2003 amendment of section 39-22-522.5, all of which remain applicable).
¶ 30 Notably, although any adjustment or disallowance of a CE tax credit must be made against the party who donated the CE, 1 Code Colo. Regs. 201-2:39-22-522(3)(j)(i)-(ii); see also § 39-22-522(7)(i), the purchaser-transferee "is subject to liability for deficiencies, interest, and penalties" that might arise through its use of a credit that is reduced or disallowed, Kowalchik v. Brohl, 2012 COA 49, ¶¶ 51-52, 411 P.3d 681. Consequently, a purchaser-transferee has an interest in purchasing credits that carry a low risk of disallowance by the Department. See id. at ¶ 23 (noting that to avoid this risk, some CE donors and transferees execute agreements stating that if the Department disallows the credit, the transferee may seek indemnification from the donor). To allow the Department to challenge the value and validity of a CE tax credit for potentially twenty-four years after it is first claimed creates a disincentive for buyers of credits, contrary to the apparent purpose of the statute. Cf.
*655 Fed. Farm Mortg. Corp. v. Schmidt, 109 Colo. 467, 473, 126 P.2d 1036, 1039 (1942) (construing a statute of limitations to further the goal of making title to property safe, secure, and marketable).
¶ 31 Indeed, the legislative history of section 39-22-522(7)(i) confirms this view. In 2005, the General Assembly enacted the first two, but not the third, sentences of subsection (7)(i).[3] Its intent, in enacting those sentences, was to ensure that the Department would have only one taxpayer with whom to address the question of value and validity of the credit where there is a CE donor and a thirdparty transferee. See Hearing on H.B. 05-1244 before the S. Finance Comm., 65th Gen. Assemb., 1st Sess. (Mar. 17, 2005) (comments of bill sponsor Sen. Jennifer Veiga).
¶ 32 In a different part of the bill, the General Assembly proposed that the Department be able to evaluate the validity and value of CE donations created as far back as January 1, 2000. Cognizant of a general four-year limitations period, Representative Mike May, a member of the House Finance Committee, expressed a concern that the proposed provision implied that the Department's authority to review CE tax credits "somehow ... goes on forever." See Hearing on H.B. 05-1244 before the H. Finance Comm., 65th Gen. Assemb., 1st Sess. (Feb. 16, 2005) (comments of Rep. Mike May). He hypothesized, for instance, that, under the proposed provision, the Department could re-evaluate the validity and value of a 2000 CE donation in 2010. Id. He asserted that taxpayers should be "home free" at some point after which they would no longer have to worry about whether their credits were valid. Id. In response to his comments, the bill was amended to remove the proposed provision stating the Department could evaluate the validity and value of CE donations "made on or after January 1, 2000."[4]
¶ 33 Significantly, Representative May's hypothetical presented the same opportunity for Department review that the Department seeks now. But the General Assembly rejected that position.
¶ 34 The third sentence of section 39-22-522(7)(i), the one containing the "same statute of limitations" language, was added in 2007, with no comment, except that it was simply a "clarification" of the law. See Bill Summary on H.B. 07-1361 to H. Finance Comm., 66th Gen. Assemb., 1st Sess. (Feb. 10, 2007).
¶ 35 In our view, the legislative history supports the conclusion that the General Assembly did not intend the statute of limitations to restart each time a CE credit is used because, under that scenario, the Department could potentially disallow a CE credit claimed twenty-four years earlier, as Representative May feared. Such an application would undermine the purposes served by the CE tax credit provisions, as recounted above.
¶ 36 The Department counters, however, that the "subject to the same statute of limitations" language of section 39-22-522(7)(i) either (1) "refers to the limitations period governing the tax returns filed in the year of credit transfer-typically Year 1, the year of CE donation"; or (2) clarifies that "the donor has the authority to control extension of the limitations period by agreement with the Department for any given year."
¶ 37 The Department supports its first interpretation by pointing to the CE tax credit statute's requirement that the CE donor and transferee file written statements confirming the amount transferred with their tax returns for the year of the transfer, which the Department calls the "year of linkage." See § 39-22-522(7)(d). It is only for this "year of *656 linkage," the Department asserts, that the statute requires the transferee to be subject to the same limitations period as the CE donor. While that may be a possible way of reading the statute, it is not, we think, the most natural, nor would it serve the purposes advanced by statute.
¶ 38 Nor do we detect anything in section 39-22-522(7)(i) supporting the Department's alternative interpretation-that by subjecting the CE donor and transferee to the same statute of limitations, the General Assembly merely intended to clarify that only the CE donor has the power to extend the statute of limitations by agreement with the Department. Indeed, because the statute already provides for this in the preceding sentence, the adoption of such an interpretation would render the entire second sentence of 39-22-522(7)(i) superfluous. See Wolford v. Pinnacol Assurance, 107 P.3d 947, 951 (Colo.2005) (Courts "must ... avoid interpretations that render statutory provisions redundant or superfluous.").
¶ 39 Further, we reject the Department's assertion that the General Assembly enacted S.B. 13-221 to cure any delays and uncertainty created by application of the "separate taxable unit" rule. We find no support for this assertion in either the text or legislative history of S.B. 13-221.
¶ 40 S.B. 13-221 provides that, before claiming a CE tax credit for a donation made on or after January 1, 2014, the donor must obtain a certificate from the Division of Real Estate affirming that the CE appraisal meets all applicable requirements. § 39-22-522(2.5) ; see also § 12-61-727, C.R.S.2014 (detailing the certification process). This pre-certification was intended to "[m]inimize uncertainty for landowners to the greatest extent possible," see S.B. 13-221, § 1(1)(b)(VI), by injecting, at the earliest possible time, the Division of Real Estate's expertise in appraisals to "avoid[ ] the situation where two [or] three years down the road the Department ... has to disallow a credit because of non-compliance." Hearing on S.B. 13-221 before the S. Finance Comm., 69th Gen. Assemb., 1st Sess. (Apr. 9, 2013) (comments of Greg Fugate, Audit Manager for the State Auditor's Office); see People v. Rockwell, 125 P.3d 410, 419 (Colo.2005) ("While less persuasive than a statement of a legislator during debate, testimony before a [legislative] committee helps illustrate the understanding of legislators and, thus, helps identify the legislative intent.").
¶ 41 In our view, the text and legislative history of S.B. 13-221 reflect an intent to reduce disputes over CE appraisals and provide no support whatsoever for the application of a statute of limitations based on a "separate taxable unit" rule.
¶ 42 Finally, we are not persuaded by the Department's argument that, unless we interpret the statute as it would have us do, it will be "powerless to stop" the following violations that might occur after the expiration of the limitations period:
• an out-of-state resident attempting to use a CE credit (violating 1 Code Colo. Regs. 201-2:39-22-522(1));
• a transferee using a transferred credit and generating his or her own CE tax credit in the same year (violating § 39-22-522(6) ); or
• a transferee attempting to claim a refund based on a CE tax credit (violating § 39-22-522(5) & (7)(c) ).
¶ 43 Notably, our interpretation here deals only with the limitations period within which the Department must determine the value and validity of the CE tax credit itself. Thus, the Department is entitled to challenge the inappropriate use of a CE tax credit, such as those listed above, so long as it challenges such use within four years.
¶ 44 We do not, by our decision, disregard our obligation to accord due deference to the interpretation of a statute by the agency charged with its enforcement. See, e.g., Heinicke v. Indus. Claim Appeals Office, 197 P.3d 220, 222 (Colo.App.2008). Ultimately, "[a]n agency's view [of the law] is ... relevant, but its construction is advisory, not binding" on a court, Expedia, Inc. v. City & Cnty. of Denver, 2014 COA 87, ¶ 29, 405 P.3d 251, and we are not bound by an agency's interpretation that is inconsistent with the clear language of, or the legislative intent *657 underlying, the statute, Heinicke, 197 P.3d at 222.
¶ 45 Based on the text of section 39-22-522(7)(i), its purposes, its legislative history, and the effects of alternative constructions, we conclude that, when read together, sections 39-22-522(7)(i) and 39-21-107(2) require that the Department determine the value and validity of a claimed CE tax credit within four years from when the credit is first claimed.
¶ 46 Our interpretation of the statutes works no unfairness to the Department. The Department is empowered to review the validity and value of claimed CE tax credits, § 39-22-522(3.5), and is obliged to review returns "[a]s soon as practicable." § 39-21-103, C.R.S.2014. To claim a CE tax credit, a CE donor must attach to the tax return in which the credit is claimed (1) two schedules-a "Colorado Conservation Easement Donor Schedule," and a "Colorado Gross Conservation Easement Credit Schedule"[5] ; (2) a summary of the CE appraisal; (3) copies of the appraisal and an affidavit by the appraiser as submitted to the Division of Real Estate; (4) the recorded deed for the CE; (5) the donor's noncash charitable contributions federal tax form; and (6) for donations made on or after January 1, 2014, a certificate from the Division of Real Estate. 1 Code Colo. Regs. 201-2:39-22-522(7); see also § 39-22-522(3.6) (certificate requirement).[6] The Department has, then, at that point all the necessary information it needs to either determine the tax credit's validity and value or to request additional information from the donor.
¶ 47 Applying our interpretation of the statutes to this case, we conclude that, ordinarily, the Department would have had until April 15, 2009, to determine the validity and value of the CE tax credits claimed by plaintiffs. Because it did not do so within that time, absent cause for tolling the limitations period, the Department would be precluded from disallowing the claimed CE tax credits.
B. False or Fraudulent Tax Returns
¶ 48 The Department contends that, even if the district court interpreted the tax statutes correctly, the CE donors were not entitled to summary judgment because there was a genuine issue of material fact as to whether they filed false or fraudulent tax returns with the intent to evade tax, a circumstance that would have allowed the tax to "be assessed and collected at any time." See § 39-21-107(4).
¶ 49 "Factual disputes will not defeat an entry of summary judgment if the disputed facts are not material to the outcome of the case." Svanidze v. Kirkendall, 169 P.3d 262, 264 (Colo.App.2007). A material fact is one that will affect the outcome of the case. W. Innovations, Inc. v. Sonitrol Corp., 187 P.3d 1155, 1158 (Colo.App.2008).
¶ 50 "In addition to concerning a material fact, the issue in dispute must be 'genuine.' To avoid summary judgment, the evidence presented in opposition to such a motion must therefore be sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party." Andersen v. Lindenbaum, 160 P.3d 237, 239 (Colo.2007) (quoting with approval Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ); see Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 ("If the evidence [opposing summary judgment] is merely colorable or is not significantly *658 probative, summary judgment may be granted." (citations omitted)).
¶ 51 In its response to the CE donors' motion for summary judgment, the Department stated that "[w]hile it [wa]s not asserting tax fraud, it has significant concerns that the Plaintiffs' tax returns were filed with false information concerning the value of their respective donations, and thus may be shown to have an intent to evade tax."
C. The Mayos' and Ricky and Kay Markus' Claimed CE Credits
¶ 52 The Department argued, both before the trial court and on appeal, that a drastic difference in value between two appraisals made with respect to the Mayos' and Ricky and Kay Markus' CEs indicated that Ricky and Kay Markus and the Mayos knew or should have known that the first appraisal was somehow false or fraudulent.
¶ 53 Ricky and Kay Markus' CE was valued, in the first appraisal, at $619,600; in the second, it was valued at $116,500. The Mayos' CE was valued, in their first appraisal, at $395,000; in the second, it was valued at $67,440. (The second appraisals were undertaken at the request of Great Outdoors Colorado (GOCO), which provided the Otero County Land Trust (the Trust) part of the funding used to purchase CEs.)
¶ 54 The district court determined that "various documents, including a group of letters between [the] Trust ... and [GOCO] [were] persuasive in showing that plaintiffs did not intend to evade taxes." Notably, these letters reflected that the Otero County Board of Commissioners (the Board), which was in charge of the Trust, did not believe that the initial appraisals were deficient, did not agree with GOCO that any CEs needed to be re-appraised, and initially would not agree to approve any re-appraisals. Furthermore, the Board was "quite concerned" that the appraisers put forth by GOCO had a possible conflict of interest because "they want to see the water moved to urban areas" rather than be tied to the land as the Trust intended. The Board sent the CE donors copies of its letters to GOCO, indicating to them that they were "quite frustrated" with GOCO's demand for new appraisals.
¶ 55 In the aftermath of the second appraisals, the Board informed the Mayos and Ricky and Kay Markus that
It has become apparent that the issue regarding the 'correct appraisal value' will never be resolved between GOCO and your appraisal. While we can understand some of the rules and regulations regarding the GOCO process, there is no doubt that our local market and appropriate values will apparently not fit GOCO's parameters.
The Board then stated that it would guarantee payment of the bids based on the CE donors' original appraisals.
¶ 56 The CE donors also provided affidavits by Edward Lee Mayo and Ricky Markus stating that they did not agree to use the value calculated by GOCO's appraiser because, unlike their first appraisals, the GOCO-commissioned appraisal "did not recognize the development of [their] water for municipal use." The Board shared this view, as demonstrated by the affidavit of an Otero county commissioner. In this affidavit, he stated that the second appraisals did not appear to consider "the developmental value of the water rights and instead valued the water rights based on sales between farmers for the agricultural use of water" and noted that this omission from the appraisal value was "contrary to the very purpose" of the Legacy Project. Further, he said that the Board "disagreed" with the second appraisals.
¶ 57 In contrast to this evidence, the Department did not produce any evidence suggesting that Ricky and Kay Markus and the Mayos knew or should have known that the initial appraisals falsely overstated the value of their CEs.
¶ 58 Nor, in our view, was such evidence supplied by information that the individual who performed the initial appraisals was later disciplined by the Colorado Board of Real Estate Appraisers. The appraiser was disciplined in May 2006, more than a year after Ricky and Kay Markus and the Mayos claimed their CE tax credits, and the Department presented no evidence that the CE donors were aware of any pending discipline at the time they filed their 2004 tax returns.
*659 ¶ 59 Under the circumstances, we conclude that any dispute of material fact as to whether Ricky and Kay Markus and the Mayos knowingly filed false or fraudulent tax returns was not genuine. Consequently, the district court properly granted summary judgment to them on this point. See Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (summary judgment may be granted if evidence in opposition is merely colorable); see also People ex rel. A.C., 170 P.3d 844, 846 (Colo.App.2007) ("A genuine issue of material fact cannot be established simply by allegations in pleadings or argument; rather, the opposing party must set forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial.").
D. Garrett and Jade Markus' Claimed CE Credit
¶ 60 There was no second appraisal on Garrett and Jade Markus' CE. But the Department nonetheless argued that the subsequent discipline of the individual who did their appraisal, as well as the fact that they had only recently purchased the land over which their CE was located from their parents for $1, should have given them reason to know that they could not claim a CE credit based on its appraised value.
¶ 61 We have already addressed and rejected the department's first reason for suspecting Garrett and Jade Markus of improper activity. As to the second, the Department relies on Hughes v. Comm'r of Internal Revenue, 97 T.C.M. (CCH) 1488, at *4 (T.C.2009), which held that, "when a taxpayer grants a conservation easement over appreciated real property held for less than 1 year, the amount of the contribution ... is limited to the conservation easement's basis at the time it is contributed."
¶ 62 The Department, however, did not present any evidence indicating that the brothers were aware of this limitation on the ability to claim an appraised value of a CE. Indeed, the Department asserts on appeal only that it should have been allowed to conduct further discovery to "fully resolve the issues of fact surrounding the Markus sons' basis in the property, their knowledge and whether they submitted false or fraudulent tax returns intending to evade tax."
¶ 63 But the Department did not make a request to conduct further discovery, as it could have done under C.R.C.P. 56(f). Arguments not presented to or ruled upon by the district court cannot be raised for the first time on appeal. See Giduck v. Niblett, 2014 COA 86, ¶ 44, 408 P.3d 856 (party failed to make in district court a C.R.C.P. 56(f) request for limited discovery); WRWC, LLC v. City of Arvada, 107 P.3d 1002, 1006 (Colo.App.2004) (party failed to move in district court for a continuance under C.R.C.P. 56(f) to conduct further discovery).
¶ 64 Consequently, we perceive no error in the district court's granting summary judgment to the Markus brothers on this point.
III. Conclusion
¶ 65 The district court properly determined that the plaintiff-CE donors were entitled, as a matter of law, to judgment on their challenge to the Department's disallowance of their claimed tax credits.
¶ 66 Accordingly, the judgment is affirmed.
JUDGE HAWTHORNE and JUDGE DUNN concur.

Ricky and Kay Markus claimed a credit of $257,248, of which they applied $3,601 to offset their 2004 tax liability; Garrett and Jade Markus claimed a credit of $98,000 (which was ultimately adjusted, because of a miscalculation, to $69,200) each, of which Jade applied $509 to offset his 2004 tax liability, and Garrett applied $516 to offset his 2004 tax liability; and, the Mayos claimed a credit of $182,120, of which they applied $567 to offset their 2004 tax liability.

At least two other states also permit the transfer of unused CE tax credits. See S.C.Code Ann. § 12-6-3515 (2013) ("[U]nused [CE] credit may be transferred, devised, or distributed, with or without consideration, by an individual, partnership, limited liability company, corporation, trust, or estate."); Va.Code Ann. § 58.1-513(C)(1) (2014) (A transfer of "unused but otherwise allowable [CE] credit for use by another taxpayer on Virginia income tax returns" is permitted.). Neither state, however, has a statute that provides that the CE donor and the transferee are subject to the same statute of limitations.

As noted above, the first two sentences of the statute read:
The donor of [a CE] for which a tax credit is claimed or the transferor of a tax credit transferred ... shall be the tax matters representative in all matters with respect to the credit. The [CE donor] ... shall be responsible for representing and binding the transferees with respect to all issues affecting the credit, including, but not limited to, the charitable contribution deduction, the appraisal, notifications and correspondence from and with the department of revenue, audit examinations, assessments or refunds, settlement agreements, and the statute of limitations.
§ 39-22-522(7)(i), C.R.S.2014.

Although several other subsections of section 39-22-522 refer to the date "January 1, 2000," none of them addresses the Department's power to review the validity and value of a CE tax credit.

This schedule lists the location, donee, and value of the CE, the date of the donation, the amount of credit claimed, the amount of the credit used for that year, the amount of the credit carried forward, the amount of the federal charitable deduction claimed for the donation, and any amount of that deduction carried forward.

When some or all of the claimed tax credits are transferred, both the donor and the transferee must file, with their tax returns, a written statement specifying the amount of the tax credit that has been transferred. § 39-22-522(7)(d).
Each time the credit is used to offset tax liability, either by the CE donor or a transferee, the taxpayer using the credit must attach a "Colorado Gross Conservation Easement Credit Schedule" to the return in which the credit is used. Dep't of Revenue Reg. 201-2, 1 Code Colo. Regs. 201-2:39-22-522(7)(a). A transferee may not use a transferred credit unless the CE donor's written statement verifies the amount of the credit transferred. § 39-22-522(7)(d).